UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                    :

UNTIED STATES OF AMERICA        :        CASE NO. 5:08-cr-00327

                           :

          Plaintiff,          :

                           :

vs.                          :        SENTENCING MEMORANDUM

                           :

ROBERT G. COLE                  :

                           :

          Defendant.        :

                           :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

      With this sentencing opinion, the Court seeks to provide a thorough explanation of its imposition of a non-guideline sentence in the case of Defendant Robert G. Cole ("Cole").  *See United States v. Liou,* 491 F.3d 334, 339 n.4 (6th Cir. 2007) (holding that "a thorough explanation is the most reliable way for a district court to make clear its reasons supporting a given sentence"); *see also Rita v. United States,* 127 S. Ct. 2456, 2468 (2007).

## I.  Background

      On August 11, 2008, the United States filed an Information charging Cole with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78(ff).  [Doc. 1.]  On September 5, 2008, the Defendant was arraigned.  On the same date, the United States and the Defendant executed a Federal Rules of Criminal Procedure Rule 11(c)(1)(A) plea agreement in which Defendant Cole pled guilty to securities fraud. [Doc. 5]

      As part of the plea agreement, Cole testified that he had worked for Diebold, Inc., an Ohio

Case No. 5:08-cr-00327
Gwin, J.

corporation headquartered in North Canton, Ohio.  Diebold  manufactures and sells ATMs, bank

security systems, and electronic voting terminals. Diebold common stock trades on the New York

Stock Exchange. Defendant Cole worked for Diebold as a sales representative in the Oklahoma area.

As a sales representative, Cole regularly received confidential information from Diebold concerning

Diebold's North American regional bank business.  Diebold prohibited corporate employees from

trading in Diebold securities when those employees possessed material nonpublic information.  Cole

knew of this policy.

Diebold regularly forecasted future earnings expectations to the public.  The charges brought

against Defendant Cole relate to his trading of Diebold shares in the interim between two of these

forecasts.  On July 27, 2005, Diebold announced its second quarter earnings and provided earnings

guidance for the third quarter  ending on September 30, 2005.  It also provided guidance for 2005

as a whole.  In a public conference call, Diebold  predicted that Diebold's earnings would be $0.62

to $0.67 per share in the third quarter of 2005 and $2.60 to $2.70 per share for the entire 2005 year.

Diebold projected third quarter revenue increases of 9 to 11 percent.

After it issued  these projections, Diebold's earnings prospects diminished.  On September

13, 2005, Diebold sales managers gave Cole and other sales representatives financial reports detailing

third quarter orders and sales information.  From these reports, Cole learned non-public information

– specifically that Diebold was not meeting its sales targets for either the third quarter of 2005 or for

2005 as a whole.  Moreover, Cole learned that Diebold's year-to-date revenues from United States

regional banks only amounted to 78.8 percent of its target revenues.  Other information that Cole

received gave further indication that Diebold  would fail to meet its revenue targets.

On September 15, 2005, and within days of receiving the non-public information mentioned

Case No. 5:08-cr-00327
Gwin, J.

above, Defendant Cole began purchasing Diebold "put option"[1] contracts at a total cost of $70,110.

Based on the same general information that Diebold had earlier given Cole, on September 21, 2005 Diebold publicly released earnings guidance that suggested lower-than-forecasted quarterly and annual earnings. With this guidance, Diebold reduced its predicted sales to American financial institutions by $50 million. As a result of this September 21, 2005 earnings warning, Diebold's stock price fell more than 16 percent from the previous day's closing price.

In the days following Diebold's September 21, 2005 earnings forecast, Cole sold all his put option contracts for approximately $579,190, realizing profits of $509,080.[2]    After Cole's put options were investigated, he disgorged all the profits that he had made. On August 4, 2008, Defendant Cole paid $509,080 to the government. Shortly thereafter, on August 11, 2008, the United States named Defendant Cole in a one count Information filed in the Northern District of Ohio. On September 5, 2008, Cole pled guilty to the Information charging him with one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78(ff). Defendant Cole appeared for sentencing on November 20, 2008. At that hearing, the Court sentenced Cole to imprisonment for one year and one day followed by two years of supervised release. The Court also imposed a $180,000 fine together with a special assessment of $100. With this opinion, the Court explains the reasons for the chosen sentence.

## II.  Sentencing Standard

---

[1] A "put option" contract is a security that gives the purchaser the right during the option period to sell 100 shares of the underlying stock at a specified price, known as the "strike price." Put options increase as the price of the underlying stock decreases and decrease when the price of the underlying stock increases.

[2] Defendant Cole used interstate commerce facilities and a national securities exchange to carry out this securities fraud. His conduct violated Rule 10b-5 of the Securities Exchange Act because he employed a scheme and artifice to defraud.

Case No. 5:08-cr-00327
Gwin, J.

Following *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are now advisory. On appellate review, while sentences that adhere to the guidelines range are presumptively reasonable, sentences that deviate from the advisory guidelines are deemed "neither presumptively reasonable nor presumptively unreasonable." *United States v. Ferguson*, 456 F.3d 660, 664-65 (6th Cir. 2006) (citations omitted).

In reaching a sentencing determination, a district court within the Sixth Circuit considers the parties' arguments, the advisory guidelines range, and the other relevant 18 U.S.C. § 3553(a) factors. See, *.e.g.*, *United States v. Jones*, 489 F.3d 243, 250-51 (6th Cir. 2007) (quoting *Ferguson*, 456 F.3d at 664.); *United States v. Jones*, 445 F.3d 865, 869 (6th Cir. 2006). After reviewing the section 3553(a) factors, under the "parsimony provision," district courts must ultimately "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in section 3553(a)(2). 18 U.S.C. § 3553(a); *see also United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006).

Recently, in *Gall v. United States,* 128 S. Ct. 586 (2007), the Supreme Court again emphasized the advisory nature of the guidelines and the district court's sentencing discretion. In *Gall*, the Supreme Court held that appellate courts reviewing the reasonableness of sentences may consider the amount of variance and extent of deviation from the advisory guideline range. The Court, however, expressly rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id.* at 595. The *Gall* Court strongly emphasized the broad discretion that district courts possess in reaching appropriate sentences and reminded appellate courts of their limited abuse of discretion review. *Id.* at 596. With *Gall*, the Supreme Court advised district courts to first calculate the applicable guidelines range and then to consider the section 3553(a)

-4-

Case No. 5:08-cr-00327
Gwin, J.

factors before reaching a decision as to the appropriate sentence. As the Court noted, "[i]n so doing, [the district court] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." *Id.* at 596-97 (citing *Rita,* 127 S. Ct. 2456).

In *Gall*, the Supreme Court also instructed that upon review of a sentence that falls outside of the advisory guidelines range, an appellate court "may not apply a presumption of unreasonableness. It may consider the extent of the deviation, but must give due deference to the district court's decision that the section 3553(a) factors, on a whole, justify the extent of the variance." *Id.* at 597. Accordingly, the Sixth Circuit now holds that "'when the district's court sentencing decision is procedurally sound,' we review the substantive reasonableness of the sentence under an abuse of discretion standard, '[r]egardless of whether the sentence imposed is inside or outside the Guidelines range.'" *United States v. Vowell,* 516 F.3d 503, 512 (6th Cir. 2008) (quoting *Gall,* 128 S. Ct. at 597).

As advised by the Supreme Court in *Gall* and consistent with *Booker*, the Court first determines the advisory guidelines range and then considers the applicable section 3553(a) factors. In arriving at a sentence, the Court is guided by the "parsimony provision," and ultimately concludes that the Court should sentence the Defendant to imprisonment for a term lower than recommended by the Guidelines and should impose a fine much greater than recommended by the Guidelines. The Court imposes a sentence of one year and one day and levees a fine of $180,000, a sentence that is "sufficient, but not greater than necessary" to fulfill the purposes of the statute.

### III. Calculation Under the Advisory Guidelines

The Court begins by calculating Defendant Cole's sentence under the advisory sentencing

Case No. 5:08-cr-00327
Gwin, J.

guidelines.  Pursuant to United States Sentencing Guidelines Manual § 2B1.4, Defendant Cole's base

offense level for the offense of securities fraud is 8.  With the crime, Cole realized a gain of $509,080.

Consistent with § 2B1.4(b)(1) and § 2B1.1(b)(1)(H), the Court adds 14 levels.   Cole accepted

responsibility for the offense and is given a three level reduction under §§ 3E1.1(a)-(b).  Under these

calculations, Defendant Cole scores an adjusted offense level of 19.  Cole has no scoreable criminal

history points and his criminal history category is I..

> With a total offense level of 19 and a criminal history category of I, the advisory guidelines

recommend that Defendant Cole serve a sentence of imprisonment of 30-37 months.  *See* U.S.S.G.

ch. 5, pt. A.  The guidelines suggest a fine between $6,000 and $60,000.  See U.S.S.G. § 5E1.2.

### IV.  Section 3553(a) Factors

> Though district courts must consider the section 3553(a) factors, the court need not explicitly

analyze each of the factors in the sentencing determination.  *See, e.g.*, *United States v. Jones*, 445

F.3d 865, 869 (6th Cir. 2006); *United States v. Johnson*, 403 F.3d 813, 816 (6th Cir. 2005).  The

section 3553(a) factors pertinent to the Defendant's case are: the nature and circumstances of the

offense; the Defendant's history and character; the purposes of sentencing; the kinds of sentences

available; the Sentencing Commission's advisory guidelines; and the need to avoid unwarranted

sentencing disparities.[3/]

_____

[3/] The section 3553(a) factors include:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed–
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to
    provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training,
    medical care, or other correctional treatment in the most effective manner;

(continued...)

Case No. 5:08-cr-00327
Gwin, J.

1.  The Nature and Circumstances of the Offense

In September 2005, Defendant Cole used material, non-public, and negative information that he received from and that concerned his employer, Diebold, to invest in put options that gained value as Diebold stock values fell when the negative information became public.  Specifically, on September 13, 2005, Defendant Cole received financial reports from Diebold stating that Diebold would not meet its financial order targets.  Within two days of receiving this information, Cole used it to purchase 776 put options, in effect betting that Diebold's stock price would fall when the negative order information became public.

Illegally using non-public information, Defendant Cole obtained profits approximating $509,080.  As described above, Cole used moderately sophisticated investment devices to obtain these profits.  Nothing suggests that Cole used nominees to carry out the trading or otherwise attempted to cover up his participation in the investment in Diebold put options.  By using this artifice to defraud, Defendant Cole violated 15 U.S.C. sections 78j(b) and 78ff(a), and 17 C.F.R. section 240.10b-5.  Based upon the evidence presented to this Court, it does not appear that Defendant Cole had previously engaged in similar fraudulent activities.

2.  The Defendant's History and Character

Defendant Robert Cole is 66 years old, having been born on February 15, 1942.  Cole grew up in Texas.  His father died when Cole was 12 years old.  After attending college where he

---

[3]/(...continued)
(3) the kinds of sentences available;
(4) . . . the [guidelines] sentencing range . . . ;
(5) any pertinent policy statement issued by the Sentencing Commission . . . ;
(6) the need to avoid unwarranted sentence disparities . . . ; and
(7) the need to provide restitution to any victims of the offense.

Case No. 5:08-cr-00327
Gwin, J.

participated in ROTC, Cole entered the army.  He ultimately rose to the rank of captain and served

with the Special Forces in Vietnam, earning two bronze stars.

In 1973, Cole took a marketing position with Diebold and he continued to work at this

company until 2008.  Most recently, Cole worked in Oklahoma City, where he was an active member

of the community.  Cole is divorced and he had custody of, and had raised, his two children.

Defendant Cole suffers from numerous physical conditions, including high blood pressure,

insomnia, arthritis, and sleep apnea.  He also suffers from depression.  He has no history of abuse of

alcohol or controlled substances.

Diebold fired Cole due to his involvement in this offense. At the time he was terminated, Cole

earned approximately $200,000 a year.  Since being fired in March 2008, Cole has been unemployed.

During his years of employment, Cole accumulated retirement accounts approaching $1 million.  With

the decline of equities over recent months, Cole says that his retirement accounts have lost significant

value.

### 3.  The Purposes of Sentencing

We have long understood that sentencing serves the purposes of retribution, deterrence,

incapacitation, and rehabilitation.  Deterrence, incapacitation, and rehabilitation are prospective and

societal–each looks forward and asks: What amount and kind of punishment will help make society

safe?  In contrast, retribution imposes punishment based upon moral culpability and asks: What

penalty is needed to restore the offender to moral standing within the community?

Federal sentencing law generally tracks these purposes.  Section 3553 tells Courts to choose

a sentence that reflects the seriousness of the offense (retribution), promotes respect for the law

(retribution, general deterence), provides just punishment for the offense (retribution), affords

Case No. 5:08-cr-00327
Gwin, J.

adequate deterrence to criminal conduct (general deterrence), protects the public from further crimes
of the Defendant (specific deterrence, incapacitation), and provides the Defendant with needed
training, care, and treatment (rehabilitation). 18 U.S.C. § 3553(a)(2). These four goals of sentencing
will be addressed in turn.

### a. Retribution

Retribution,   involves the calculation of moral culpability, with society gauging the
seriousness of the offense and the response that society believes an appropriate  response to the
offense.  In general, retribution imposes punishment to reflect respect for the dignity of the victim.
Stated otherwise, society stands with victims and exacts punishment in rough approximation to the
detriment caused by the defendant.   Retributive or "just deserts" theory considerations study the
defendant's past actions and the effect of these actions on the victim or victims of the crime, not the
defendant's probable future conduct or the effect that  his or her punishment might have on others
in society..[4/] In recent years, retribution has played a more important, if not dominating, role in
sentencing determinations.  *See, e.g.* Model Penal Code: Sentencing, Tentative Draft No. 1, April 9,
2007) ("The general purposes of the provisions on sentencing [] in decisions affecting the sentencing
of individual offenders: to render sentences in all cases within a range of severity proportionate to the
gravity of offenses, the harms done to crime victims, and the blameworthiness of offenders. . . .")

To address the retributive goals of sentencing, the Court considers the effect of Defendant
Cole's  acts.  In enacting the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Securities

---

[4/]  Richard Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment:
"Proportionality" Relative to What?*, 89 MINN. L. REV. 571, 590 (2005).

Case No. 5:08-cr-00327
Gwin, J.

Exchange Act of 1934, 15 U.S.C. § 78a *et seq*., Congress established a regulatory system that requires disclosure of all material aspects of transactions involving securities. Federal securities laws dictate that investors can be protected only if all relevant aspects of market transactions are fully and fairly disclosed and if investment decisions are made based upon information available to all investors.

Defendant Cole's misappropriation of non-public information undermines a cornerstone of our investment regulation policy. Moreover, when Cole used his knowledge of Diebold's reduced orders to purchase put options in September 2005, he disadvantaged other, legitimate investors in his September 2005 purchase of put options. Society deserves retribution resulting from the damage Cole imposed upon persons involved with the September transactions and to the securities markets generally. With regard to fulfilling the need for the sentence to impose retribution, this Court finds that Cole should be punished significantly.

### b. Rehabilitation

Rehabilitation, generally, endeavors to turn one person's path. Although rehabilitation plays a lesser role after the adoption of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*, section 3553(a) directs this Court to consider the protection of the public and the improvement of the offender's conduct. Defendant Cole scores no criminal history points and has a criminal history classification of I. Given his lack of any scoreable criminal record, the rehabilitation federal sentencing goal is not implicated in Cole's case.

### c. Incapacitation

In this case, there is little need for incapacitation. Cole has no appreciable prior record of criminal conduct. He did not engage in any violent offense and it is highly unlikely that he will be

in a position to use insider information in the future. The Court therefore finds that incapacitation is not a significant concern in this case .

*d. Deterrence*

Under section 3553(a), this Court must impose a sentence that is sufficient to protect the public. Deterrence has both a specific and a general function. Specific deterrence dissuades the particular defendant from engaging in criminal conduct. In contrast, general deterrence discourages others from engaging in similar criminal conduct.

The Court first considers what punishment should be imposed to deter Defendant Cole from additional criminal conduct. After considering Cole's background and history, the Court finds little risk that Cole will himself re-offend because Cole's age and termination from his employment at Diebold indicate that he is unlikely to be in a position to repeat his insider trading and Cole has no history of prior criminal conduct.[5/]

A more difficult calculation, however, is the punishment necessary to dissuade others from engaging in similar conduct. General deterrence uses a utilitarian calculation, subjecting defendants to longer periods of incarceration than retribution requires to "send a message" to other potential offenders. Inherent in this general deterrence calculation is a tension between individual dignity and societal good, begging the question: Is it ethical to impose a greater-than necessary punishment upon an individual criminal defendant to protect society at large?

---

[5/] Some inconclusive evidence suggests that in 1972 Cole may have been convicted of driving under the influence of alcohol. Given that th offense, even if it occurred, took place more than 36 years ago, the Court concludes that it is of limited importance with respect to its decision regarding the deterrent nature of Defendant Cole's sentence.

Case No. 5:08-cr-00327
Gwin, J.

Jeremy Bentham believed that deterrence alone justifies punishment: "General prevention ought to be the chief end of punishment, as it is its real justification. If we could consider an offence which has been committed as an isolated fact, the like of which would never recur, punishment would be useless. It would be only adding one evil to another."[6]  Although somewhat unique in believing that deterrence is the only justification for punishment, Bentham also gave a standard description of the calculation involved: "the evil of the punishment must be made to exceed the advantage of the offense."[7]

Bentham's view of deterrence, however, creates potential conflicts with other sentencing goals.  For example, sentencing principally seeks retribution – the punishment that society exacts before permitting the offender to rejoin that society.  If such retribution is obtained, does a fair society impose an additional punishment to use the offender as an example?[8]  Kant did not agree with this notion, explaining that

> Juridical Punishment can never be administered merely as a means for promoting another Good either with regard to the Criminal himself or to Civil Society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a Crime. For one man ought never to be dealt with merely as a means subservient to the purpose of another.[9]

---

[6]  JEREMY BENTHAM, THE RATIONAL OF PUNISHMENT 20 (Adamant Media 2003), *available at* http://www.laits.utexas.edu/poltheory/bentham/rp/.

[7]  JEREMY BENTHAM, THEORY OF LEGISLATION (Harcourt Brace 1931).

[8]  Various three-strike statutes provide examples of this tension.  Under 21 U.S.C. § 841(b), defendants who possess 50 grams or more of cocaine base with an intent to distribute and who have had two or more prior convictions for a felony drug offense "shall be sentenced to a mandatory term of life imprisonment without release."  Fifty grams of cocaine base typically sells for roughly $2,000.  Does a moral society incarcerate a citizen for life because he or she sold $2,000 of drugs, particularly since the prior convictions involved typically concern small-quantity possession charges resulting in sentences of probation?   Similarly, does a moral society sentence a petty thief to two consecutive sentences of 25 years to life for stealing $150 of videotapes? See *Lockyer v. Andrade*, 538 U.S. 63 (2003).

[9]  IMMANUEL KANT, THE PHILOSOPHY OF LAW: AN EXPOSITION OF THE FUNDAMENTAL PRINCIPLES OF
(continued...)

-12-

Case No. 5:08-cr-00327
Gwin, J.

Hegel similarly believed that punishment must be derived from the criminal's own acts and that convicts should not be "treated either as a harmful animal who has to be made harmless, or with a view to deterring and reforming him."[10] The philosophical underpinnings of general deterrence thus create problems in the sentencing context.

Apart from any philosophical difficulties, the general deterrence concept also suffers from potential economic inefficiencies. Increased penalties, including an increased rate of imprisonment, likely reduce crime both by incapacitating and by deterring potential offenders.[11] But imprisonment costs tax-payers roughly $2,100 per month. Moreover, society suffers other lost opportunity costs with imprisonment including foregone earnings, as well as an accompanying loss of tax revenue[12] With over 2.25 million Americans incarcerated and with the United States having the highest incarceration rate worldwide, does incarceration efficiently deter crime?. Indeed, for some offenders, the additional cost associated with their imprisonment exceeds the benefit to society of deterring their crimes .

As described above, this Court must consider general deterrence independent of what punishment is needed to individually deter Defendant Cole from future criminal conduct. In the

---

[9]/(...continued)
JURISPRUDENCE AS THE SCIENCE OF RIGHT ¶ 549 (W. Hastie trans., Edinburgh: Clark, 1887), *available at* http://oll.libertyfund.org/title/359/55842/64104.

[10]/ GEORG WILHELM FRIEDRICH HEGEL, PHILOSOPHY OF RIGHT 71 (T.M. Knox trans., Oxford Univ. Press 1942) (1821).

[11]/ *See* Lawrence Katz, Steven D. Levitt & Ellen Shustorovich, *Prison Conditions, Capital Punishment, and Deterrence*, 5 AM. L. & ECON. REV. 318 (2003).

[12]/ *See* Gary S. Becker, *Crime and Punishment: An Economic Approach*, 76 J. OF POL. ECON. 169, 179 (1968) ("[T]he cost of an imprisonment is the discounted sum of the earnings foregone and the value placed in the restrictions in consumption and freedom.").

Case No. 5:08-cr-00327
Gwin, J.

present circumstances, the Court finds that imprisonment of a significant duration that isless than the recommended guideline range, joined with a substantial fine, best deters  other potential offenders from similar criminal activity.[13]   Put otherwise, this Court believes that imprisonment,  combined with an $180,000 fine, acts as a greater deterrent to others similarly situated  to Cole than a thirty-month prison term.

In this case, the Court imposed a fine of $180,000.  Defendant Cole earlier disgorged more than $500,000 in illicitly-gotten gains.  At the time of sentencing, Cole enjoyed a net worth of roughly $1 million, most of which is held in retirement accounts.  Like nearly all investors, Cole has lost significant value to these retirement accounts over the last months.  Against this backdrop, the $180,000 fine represents approximately 20% of Cole's net worth.  The Court considers this a significant but sufficient fine.

### 4. The Kinds of Sentences Available

The Court cannot sentence Defendant Cole to a term of imprisonment greater than 20 years. 15 U.S.C. §§ 78j(b) and 78ff.  Cole qualifies under 18 U.S.C. section 3561(a) for parole.  The Guidelines recommend against probation.  U.S.S.G. § 5B1.1 application note 2.

### 5. The Sentencing Commission's Advisory Guidelines Range

As described above, the advisory guidelines recommend imprisonment for 30-37 months. *See* U.S.S.G. ch. 5, pt. A.  The Guidelines additionally recommend a fine between $6,000 and $60,000. U.S.S.G. § 5E1.2.  The Defendant argues for imprisonment below the Guideline range, saying that his background warrant a variance from the Sentencing Commission's recommendation.  He says that

---

[13]/ Becker, *supra* note 12, at 193 (noting that "social welfare is increased if fines are used whenever feasible").

-14-

Case No. 5:08-cr-00327
Gwin, J.

the section 3553(a) factors counsel for a sentence of one year and one day. He also asks the Court

not to impose more than a minimal fine, saying that his net worth has declined by more than $160,000

since the pre-sentence report was prepared as a result of the collapse of the equities markets. [Doc.

13 at 24.]

### 6. The Need to Avoid Unwarranted Sentencing Disparities

Nationwide, similar offenders are more likely to receive non-prison sentences for fraud

convictions. In 2007, 58.8% of defendants nationwide and 67.6% of Sixth Circuit defendants

convicted of fraud offenses were given non-prison sentences. *See* United States Sentencing

Commission, Office of Policy Analysis, Type of Sentence Imposed by Primary Offense

Category-2007 (Table 6), *available at* http://www.ussc.gov/JUDPACK/2007/6c07.pdf. Among

fraud defendants given prison sentences, the median sentence was 16 months. *Id.* at Table 7. The

instant sentence is not disparate from the treatment of similar offenders. The Court believes that this

sentence avoids *unwarranted* sentencing disparities.

### V. Sentencing Decision

After a thorough consideration of the parties' arguments, the advisory guidelines range, and

the other relevant 18 U.S.C. section 3553(a) factors, the Court chooses not to follow the advisory

guidelines. In this case, the Court concludes that a sentence within the guidelines range is not

appropriate to satisfy the purposes of criminal punishment.

Defendant Cole has a commendable past: a productive work history, a lack of any past

criminal history, admirable military service, community involvement, and a history of having sacrificed

to raise two children. His sole explanation for his crime was greed, however, even though his

earnings placed him in the top 3% of wage earners. Moreover, with his actions, Cole betrayed his

-15-

Case No. 5:08-cr-00327
Gwin, J.

employer's trust and cheated market participants.

The imposed term of imprisonment, while lower than the guideline range, still represents a significant period of incarceration considering Cole's age and physical condition. The fine, while higher than the guideline range, serves to adequately protect society from similar conduct. This Court is mindful of the motivation for this crime and also of Cole's diminished standard of living resulting from the fine. At roughly 20% of the wealth that Cole has worked for over 40 years to accumulate, this fine appropriately deters the rest of society from engaging in similar conduct.

The Court therefore finds that a sentence of one year and one day, joined with the restitution that has already occurred and a fine of $180,000, reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the Defendant. *See* 18 U.S.C. § 3553(a)(2).

## VI. Conclusion

For the reasons stated above, the Court sentences the Defendant to a prison term of one year and one day and a fine of $180,000, together with a two year term of supervised release and a special assessment of $100.

IT IS SO ORDERED.

Dated: December 12, 2008                    s/          *James S. Gwin*
                                            JAMES S. GWIN
                                            UNITED STATES DISTRICT JUDGE

-16-